Good morning. My name is John Young. I represent Jose Rivera. I was hoping I'd be able to drive here in my beautiful car by now. Oh, by the way, I understand you all wanted to divide your time three ways. Is that what we're doing? So, set the clock for four minutes? Yeah. Yeah. Okay. Go ahead. Yeah, I will stay within my five minutes, so I want to get right to the point. The point I want to make is that FEMA's Flood Smart Cooperative allowed third-party cost sharing. That's my point. But doesn't any evidence here that any of the insurance agencies actually paid any money? So, who was sharing the cost here, other than the taxpayers? Well, the insurance agency did not. Somebody has to pay the cost. But the evidence in the trial was that the insurance agency never paid a nickel. No, so it worked out for them. It was represented to FEMA that they paid either $4,000 or $5,000. They paid that in the form of a credit that was made to their accounts as seasons. That's not a payment. I mean, that's a lawyer's characterization of what looks like a duck, walks like a duck, drives like a duck. I mean, it's payment. I don't see cash here. And I think a lack of lawyers is what got this started is nobody wanted to talk to a lawyer. FEMA's own interpretation of its own rules were that it would allow third-party cost sharing. The best exhibit that I have in that regard. This doesn't answer my question. Who shared the cost? It looks to me like the whole burden was on the taxpayer, not on anybody else's shoulders. Well, as my client keeps pointing out to me, there's nothing that's free but the rate. And what FEMA was interested in, what they asked in their rules, or what's at stake. Was FEMA contemplating that their insurance agents who sell flood insurance under the FEMA program would be covering part of the cost and FEMA would cover the bulk? Wasn't that what the program was designed to do? No, they specifically said it did not have to be the insurance agents that covered part of the cost. They said the city of Tucson wanted to cover the cost. No, FEMA wasn't offering free insurance or free advertising. They were offering a mechanism by which there could be advertising of the program and partial payment of the cost of the advertising by FEMA. But somebody else, either the insurance agency or, in your theory, some other third party, would have to come up with the rest of the money. And what's missing here, is there any evidence of the rest of the money or a different source? Well, the rest of the money came out of my client's pocket. My client was a salesman. He gave up his commission in order to make sales. Wasn't the representation that was made to FEMA the representation that the insurance agency had paid the other portion of the advertising? Isn't that correct? Yeah, that is the third party cost sharing. But that representation was not true? That the insurance agents had actually not paid any part of the advertising? But it was true. It was collected in the form of a credit to each account. So you're not going to be doing it the same way with CUNY? I don't think you've been counseling? The exhibit that I wanted to point to is Exhibit 307. It's EOR 349. And what FEMA says in EOR 349 is the original invoice must include rates. What they're looking for is rates. They're not looking for final price, transaction price, out-of-pocket costs. Those are lawyer words. Well, it was not about rates because, as I understood it, there were different rates depending on whether or not the rate schedule was obtained anonymously versus a rate schedule that was developed for FEMA. And to maximize up to $10,000, the amount of reimbursement. So rates always, it's been a long time since I've bought a car, but rates are always subject to variation. When I buy Cheerios. This is kind of like how manufacturers suggest their retail price, but it's never prescribable. Exactly. It's kind of like the price of Cheerios, except for it's negotiable. When I buy Cheerios, they're $6 a box. With my wife, it's just $4. They asked me if I'm a student. They asked me if I'm a senior citizen. They asked me if I'm military, firefighter, police. Apparently, I'm the only person to pay $6 a box for Cheerios. And that is the problem with any pricing. It will ask us what the rate is. The rate is constantly variable depending on who's selling and what they're willing to do. It doesn't get harder. It doesn't get harder than it is. Yeah. Let's take your question. I don't know. I did. Let's take it. Good afternoon, members. I'm Chris Levy, and I represent Joaquin Moreno in the same manner. And I'm a police reporter. Judge, I think what you're getting is you're a potential competent agency. And I want to answer that question, and I'm focusing my argument on the materiality question. Frankly, Your Honor, what you were just asking, whether they claimed that they did, that the insurance agents were paying for it, that was a misrepresentation. They didn't make in all of the contracts. Some of the contracts actually had no misrepresentation. And FEMA still paid. And that's the issue, Judge. Well, wasn't there testimony from the woman from FEMA that had she known that the insurance agencies had not paid, that FEMA wouldn't have issued insurance? Judge, that was the testimony. And I'd like to read a mention from the record from that, with respect to that. But I just want to say that was the testimony on direct contamination, but it did not hold up on cross-contamination. So I don't believe the evidence in the label is favorable to the government's verdicts. But even though you blistered her on cross-contamination, the jury still noted that FEMA was representing FEMA. I'd answer no. Judge, the fact is that Ms. Lozano admitted that they paid, whether they claimed the insurance agent paid on the contract or not. She also said specifically it was never written in the website that it was required at the age of being 25%. She clarified that it was the intention of the program, but admitted it wasn't indicated in any policies or procedures outlined in the website or anywhere else where somebody could read it or follow it. And therefore, it's a notice issue as well. Wasn't the rate structure, though, the payment that the program wanted to keep because the insurance was over? Judge, in the entrepreneurial sphere, these three guys who were developing this business for the purpose of developing this consultant, the government said what they were going to pay. And they said that they were going to pay a maximum of this much on that. Why not maximize the profit? I mean, if there was some product of value delivered, right, but didn't the jury find by its verdict that there was no product that was actually distributed? And so therefore, the government didn't get the benefit of any of it. Absolutely not. The government's theory of the case at the very beginning was that this was a complete scam. This whole magazine was a scam, that they didn't make any copies except the middle rounds, four, three, or ten, in order to get the tariff sheets. They learned midway through trial that that was absolutely not the case, that they actually produced thousands of these copies and made many, many copies. And there's no evidence one way or the other about distribution or not. Well, I'm sorry. There was no evidence that ever that magazine ever showed up at any of those offices. There's no evidence that it did. Well, the jury judges certainly have inferred that, in fact, they produced it. And while they printed more copies than they necessarily needed, they produced it so that they could get their fair share. You see, the evidence that can be inferred, Judge, is that it produced thousands of these, and then there's evidence that came out, that they traveled around the Southwest, they traveled to Palm Springs, they traveled to Las Vegas, and they traveled to all these places. So they didn't just make this scheme to keep this money, and then pocket the money. They actually reinvested it into themselves, into their businesses, doing what they were doing. And although there is no evidence, the government didn't call any witnesses that said that they saw it out there. There's no witness that said they did it. Some of the jurors did, but the only jurors that they saw are the only evidence in the magazine they saw was the one they got. Right. So, there's no evidence. Well, I'm not going to get into that, but the evidence of them traveling and producing thousands of these magazines is evidence of this tradition. I'll come back and talk to you. All right. Okay. I'm going to come towards this board. Okay. Okay. Good morning, Your Honors. I'm sorry, we're due for Sunday. Camarillo, Campana, Morito, which I referred to as Campana in my reply brief. And the first order of business is my reply brief should not be stricken and responded to the government's belated jab to try to stick Campana with his brother, Mr. Rivera, in discursing and in terms of, you know. Okay, ma'am. Can I ask this? I mean, you, when you joined your court counsel's briefs, you knew that they hadn't raised any argument that was specific as to the evidence that was on your hearing. And I'm confident they could have, Your Honor. I mean. Right. So if you wanted to raise those arguments on his behalf, you weren't so obligated to file that brief, Your Honor. How did you think they would sound? Until the government response came out, it was unclear whether she was going to distinguish Campana from the other two at all. And as you can observe, her response is replete with they, they, they. Yeah. Campana was never on any incorporation. He was not on any account to write a check, to pay for paper, to pay for a printer. He was not a part of the first eight contracts that were entered into. What about her? He's run that since. If you don't open it, if there's been a reason in the opening and argue it clearly and distinctly, you can't reason from the first time in the reply. Well, if we can isolate the reply, I have a right to reply to a new theory. A new theory is it's a family affair. In fact, I searched every transcript from each other. I was not at trial. Right, you were not at trial. These gentlemen weren't at trial. So I had to. Okay. And I searched every transcript for family affair, family connection. Let's stick Jose, not Jose, Joaquin and Amelio. Let's see who could put them together. Some of the answers, they said, Judge, means I didn't know he had a brother, meaning didn't know Joaquin had a brother named Amelio. There was no argument made by the government whatsoever to attempt to persuade, to attempt to link Amelio to Joaquin through the family affair. Yes, she was attempting to persuade this court. And I stand by the fact that I had a right to respond to that. So are you basically making a sufficient argument, evidence argument, Well, first off, I think it was an attempt to, just a clue on to campaign on to get him to stay Joaquin. So it is a sufficient evidence. I was essentially convicted, wrongfully convicted, because there's not enough evidence to establish my intent to defraud or report my active participation, active and knowing participation in this case. And essentially, the reply briefs responded. You were saying, oh, there was sufficient evidence, because everybody raised Rule 29. Because until she began, I mean, I believed the Rule 29 argument made by my counsel was sufficient to all. I still believe that. It wasn't until the government tried to enhance the link connection campaign I had to them that I felt I had replied to him. Thank you. Thank you very much. Thank you. Good morning, Your Honors. My name is Erica McCallum. I'm from the District of Arizona, Tucson, and I'm representing the government here. It appears that this panel well understands the strength of the evidence and also the deferential review standard with regard to the sufficiency of the evidence here. I'm not sure I need to discuss it any further than I did in my answering brief. As you also have observed today, D'Amelio did file a reply brief, which I did not have an opportunity to respond to, I guess. I was going to say, I'd like to hear your response, because I wasn't up front enough. And you explained maybe it's not, but you didn't have the chance to respond, so I'd like to hear that. Thank you. I appreciate that. For starters, I'd just like to point out that the Rule 29 motion at the end of the trial was brought and made primarily argued by Mr. Kampana's counsel. So Kampana was certainly an active participant at the trial, and the court specifically considered whether there was abuse of evidence for his connection to another Rule 29 motion. Okay, so did Mr. Kampana have knowledge of the fraud and intend to be a participant in it? And that answer is really very simple. He knew because he sold policies to at least five of the agents. He broke down the contract terms. He told the agents, and this is all based on trial testimony, he told each and every one of those agents that the program was free to them. They did not have to pay anything. And yet he wrote on those contracts that they had paid a certain quantity, either $4,000 or $5,000. So he knew he was to aid. This is a cost-free program, and this is going to the government, and the agents are not going to pay anything. Another piece of evidence, which is really compelling here, is that the agents themselves knew that there was something fishy about this contract. In fact, one of the agents, Ms. Marcosco, said she thought it was, quote-unquote, too good to be true. And after she signed the contract, she tried to back out. Mr. Kampana sold her that contract. She did. She tried to back out of the contract, cancel the deal, and Mr. Kampana told her, no, if you do, you're going to be liable for the full $15,000 amount. He also, another agent he spoke to, Mr. Deary, said that he specifically discussed that particular contract condition with Mr. Kampana. He said, why are you writing down $4,000 when I'm not paying anything? Mr. Kampana gave him an explanation for it. He specifically discussed it, which is, this is just how you fill out these contracts, but don't worry, it's going to be no cost to you. And Mr. Deary testified he thought that that seemed funny. So if the agents themselves are saying, this is fishy, clearly the person that's selling them the contract knows it's a fraudulent term. He did, was there evidence that this defendant gave up on the deal when he tried to get the contract in 2015? I think this would be a person of interest. Yes, because he was, when the defendants visited the agents, either singly or in pairs, Mr. Kampana, usually it was Junior or, it was one or the other. Junior was not, he is Miranda's son. He was not charged, but he was one of the people who was participating. When they went together, Kampana was identified by the agent as the leader. In other words, the person who was explaining the details of the program to them. So part of the preoccupation process that they did with the agents was to fill out a form on the computer, on the FEMA website. And Kampana was familiar with how that worked and what information he put in to get that preapproval for the $15,000 ad. In addition, one of the agents that he sold to, Ms. Macalasco, received a $250 kickback. This is a woman who tried to withdraw or cancel her ad and she ended up getting money back, the inference being that it was to help her to keep it quiet, basically, so that not only was her ad free, but she got a benefit from it. Mr. Kampana told another agent, Ramos, the distribution of the magazine would be 48,000 to 68,000 copies in circulation, which was just a blink of falsehood. In the end, they ended up printing 2,000 copies, and as you've noted today, there's no reliable evidence whatsoever that it was distributed. They were distributed anywhere. Why would they put in that many copies at an expensive, what was it, $14,000 or $15,000? I would say that it was definitely not necessary to do that. The person literally just needed to cover an ad. Sure. They're referring to, well, were there any number of reasons that they could have done the printing? As they did the trial, their argument was, well, we incurred travel expenses subverted to these areas after this scheme was completed, so that meant we were distributing copies. Well, it could have meant that they were, they could have been working on another scheme. Yeah, I know that. So there's that. I was asking, why would they go to these bets and print so many copies? Your theory is that something was just depleted from the company and it got cut, so if that were true, why would they waste $14,000 or $15,000 to print all of these copies? Well, you could look at Mr. Brenna's statement to the investigators when he was arrested, which was, well, we printed it. So it was a legit magazine. In other words, plausible to deny identity. Was the order for the additional magazines placed after the matter was reported to the police? Yes, the matter was reported to the police on November 15th, and the magazines were printed in December. Now, 2,000 sounds like a lot, but what it really is, there are five markets, Tucson, Scottsdale, Yuma, Palm Springs, so they printed 250 copies for each market for summer, which is the 22 invoices that they were reimbursed for. Then they printed for three markets for winter, which is a whole other set of 24 agents that, before it was reported to the police, they were in the process of applying for reimbursement. So, for FEMA. So, we reached their answer after we found out that the police were starting to investigate. They ordered additional copies printed in order to make it look like it was legitimate. That is a reasonable inference, yes. So, if there are no further questions, I submit on my agreement to you to restitution. Thank you very much. I can do this in 22 seconds. Great. I wanted to address the most blatant frauds that were taking place at one time. There was factual finding by Judge Marquez that there was a magazine that was published that was written backwards. So, February 8th, that's page 19, that's E4, page 23. It's also in the government's exhibit 168 and 170. Both co-authors have now distributed the magazine, and the government itself applies to extensive post-publication travel expenditures, which are listed on page 105. Do you know if those expenses were incurred after the matter was reported, or since when it was reported? My recollection, and I don't recollect the exact date that went into the Tucson Police Department, but the overall arc of what happened here was these guys really bootstrapped this magazine. They went out, they sold the advertising, and they got payment to approve it in the spring. By the fall, they were selling it at a lower rate. They traded a small run, I think it was a 50-copy run, and they used those covers and those ads to get the reimbursements. Once they had the reimbursements, then they had the money that they were able to pay for the publication, and then they went out and published another 200 or 250 copies in each of five jurisdictions. This is from the Department of the Distributive Bureau. I'm not familiar with this report. I had it the other day. It turns out that it's hard to dwell on materiality anymore. The instructive case is SO4-137-6000, the Hudson Street Court in 1989. And in that case, like SOR, in this case because the government threw its contractor, acted as the only entity in the market of soliciting the media so they could advertise flood insurance and manage the reimbursement for a group of subsidized, which distinguishes it from the entity. And I just want to point out a quote from SOR, which I think is pretty instructive and crucial. According to my support, proof of materiality can include, but it's not necessarily limited to, evidence that the defendant knows that the government consistently refuses to pay claims in a mine run of cases based on noncompliance with particular statutory, regulatory, and constitutional law of the environment. Conversely, in this case, the important point is that if the government pays a particular claim in full, despite its actual knowledge that certain requirements were violated, that it's very strong evidence that those requirements are not material. Or, if the government regularly pays a particular type of claim in full, despite its actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material. In this case, Judge, that's exactly what happened. That's exactly what happened. That's what occurred. Thank you very much. Whether a rational juror could have found misrepresentation that was material, beyond a reasonable doubt, is now up to the Sonoma Court. Even if you find that, whether Gamaleo, Campiana, or Reno knew there was a material misrepresentation in the contract he was offering to help his brother, and intended to conspire to do that, it is your determination whether a rational juror could have found that. Thank you all very much. The case is now again submitted, and we're adjourned for the day. Thank you.
judges: Tallman, Watford, Guirola